Filed 6/21/22  P. v. Ulloa CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSEPH AARON ULLOA,<br><br>    Defendant and Appellant. | F078977<br><br>(Super. Ct. No. VCF244038)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Gary L. Paden, Judge.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Kathryn L. Althizer and Catherine Chatman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Three-month-old Jackson Ulloa[1] died from blunt force head trauma inflicted while in the care of Joseph Aaron Ulloa (defendant). A jury convicted defendant of second degree murder and assault on a child causing death. The trial court sentenced defendant to 25 years to life in state prison. On appeal, defendant argues that (1) the murder conviction is not supported by sufficient evidence of implied malice; (2) the trial court erred in admitting defendant's un-*Mirandized* prearrest interview with a detective;[2] (3) the trial court erred in determining that defendant's prearrest interview was voluntarily given; (4) the trial court erred in failing to instruct the jury on involuntary manslaughter as a lesser included offense of murder; and (5) we should strike defendant's $1,000 fine pursuant to Penal Code[3] section 294, subdivision (a) as unauthorized. In supplemental briefing, defendant also argues he is entitled to be resentenced under the new sentencing provisions in section 654, which became effective on January 1, 2022. (Stats. 2021, ch. 441, § 1.)

The People agree remand is required for resentencing under recently amended section 654, as do we. In resentencing defendant, the trial court shall not impose a fine pursuant to section 294, subdivision (a). We affirm the judgment in all other respects.

## PROCEDURAL BACKGROUND

The District Attorney of Tulare County filed an information on August 22, 2011, charging defendant with murder (§ 187, subd. (a); count 1) and assault on a child causing death (§ 273ab, subd. (a); count 2). As to count 1, the information alleged the special circumstance that the murder was intentional and involved the infliction of torture

---

[1]    Pursuant to California Rules of Court, rule 8.90 and for clarity and convenience because some individuals share a last name, we refer to certain persons by their first names and/or initials. No disrespect is intended.

[2]    *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*)

[3]    Undesignated statutory references are to the Penal Code.

2.

(§ 190.2, subd. (a)(18)). The trial court granted defendant's motion to set aside the special circumstance allegation for insufficient evidence on June 30, 2017. We affirmed the trial court's dismissal of the torture-murder special circumstance. (*People v. Ulloa* (Apr. 10, 2018, F075954) [nonpub. opn.].)

After an 11-day trial, on October 17, 2018, the jury acquitted defendant of first degree murder and convicted him of both second degree murder and assault on a child causing death.

On March 11, 2019, the trial court denied defendant's motion for new trial and sentenced defendant to a term of 25 years to life as to count 2 and a term of 15 years to life as to count 1 that was stayed pursuant to section 654. The court also ordered defendant to pay an aggregate $80 court operations assessment (§ 1465.8), an aggregate $60 criminal conviction assessment (Gov. Code, § 70373), a $350 restitution fine (former § 1202.4), a suspended $350 parole revocation restitution fine (§ 1202.45, subd. (a)), a $1,000 child abuse prevention restitution fine (§ 294, subd. (a)), and the trial court retained jurisdiction over victim restitution (former § 1202.4, subd. (f)(2)).

This timely appeal followed on March 15, 2019.

## FACTS

### I. *Prosecution's evidence.*

#### A. Events Leading to Jackson's Death

J.B. was Jackson's biological mother, and defendant, to whom J.B. was married, was Jackson's biological father. J.B. gave birth to Jackson by Caesarean section (C-section) on June 27, 2010,[4] at a hospital in Porterville. Jackson was premature by approximately two weeks[5] and weighed almost six pounds. Because he was having

---

[4] Subsequent references to dates are to dates in the year 2010 unless otherwise stated.

[5] Jackson was born at 35.4 weeks' gestation and classified as premature because he was born before 37 weeks' gestation.

3.

breathing problems, Jackson was transferred to Valley Children's Hospital for further treatment and remained there for approximately three weeks.

J.B. brought Jackson home to their one-bedroom apartment in Porterville when he was approximately one month old, and he would sometimes sleep through the night. Jackson loved to eat and would wake up at feeding time. J.B. bottle-fed Jackson every two to three hours, using a boppy pillow (described as a doughnut-like pillow that is elevated in the back to aid the baby in sitting) to support his head. She had no problems with Jackson, and he was a good sleeper. J.B. did not go back to work right away and stayed home with Jackson. While she took Jackson to her parents' residence a couple of times a week, she did not otherwise take Jackson outside of the apartment.

J.B. testified that defendant did not really want to hold Jackson in the hospital after he was born, and she did not know if defendant was really "into being a daddy." J.B. went back to work a week or so before September 23. She worked from 7:00 a.m. until 12:00 or 1:00 p.m. Defendant worked for a newspaper on weekdays in the afternoons or early evenings and came home at different times. Defendant watched Jackson when J.B. went back to work, but she was his primary caregiver and would get up at night with him.

During that period of time, J.B. returned home from work and saw that Jackson had "a big scrape" on his cheek. Defendant said that he had accidentally rolled over onto Jackson while they were sleeping. J.B. took a photograph of the scrape. Because it was the first time something had happened to Jackson, she believed the explanation.

Another time, J.B. heard Jackson scream and she saw defendant pull Jackson off the boppy pillow by his legs, causing his head to flop backwards. J.B. was so angry that she left with her father and did not return to the apartment for a day or two.

J.B. returned home from work one day and defendant told her that she would be angry because he had swaddled Jackson too tightly and bruised Jackson's wrist. J.B. took photographs of the bruise on Jackson's wrist. J.B. testified that she had previously

4.

told defendant he was being too rough "but he would do it really firm. It's not like how you would think a person would handle something that tiny."

J.B. testified that during the time defendant watched Jackson, she began to notice pattern-like bruises on his sides, upper back, and arms. J.B. explained that she did not think Jackson's marks were bruises at first because they started slow and she had given Jackson Tylenol after he had his shots. But as the bruising increased, her mother advised J.B. to take Jackson to the doctor.[6] The doctor did not know what the bruises could be and suggested taking him to the emergency room, but she did not stay in the emergency room because people had whooping cough. The marks appeared to go away when she stopped providing Tylenol to Jackson.

Defendant returned home from work at approximately 3:00 a.m. on the morning of September 23. While defendant went to bed, J.B. stayed up with Jackson in the living room and laid on the couch with him on her chest until 6:00 a.m. J.B. fed Jackson twice before she left for work at 9:00 a.m.[7] While Jackson did not vomit that morning, he snorted while he was eating and had milk dripping down his chin. This was not normal and J.B. worried that something was wrong. J.B. later told Detective Green that she had a bad feeling about going to work and leaving Jackson at home. J.B. asked defendant to burp Jackson before she left.

Defendant called her at work and told her Jackson was not breathing. J.B. and defendant visited Jackson at the hospital together until she learned the results of the CAT scan and that Jackson had been abused. The doctors told her Jackson had trauma points on his head and had been thrown or hit, comparing his injuries to a "60-mile-an-hour car

---

[6]   J.B. took Jackson to see the doctor on September 17.

[7]   J.B. was overheard telling a nurse at the hospital, "Something told me not to leave some morning because he was gagging, throwing up when I tried to feed him."

crash." J.B. asked defendant if he had an accident with Jackson because of the injuries to Jackson's head. Defendant denied that anything had happened.

After that, J.B. moved in with her parents and was scared of defendant because she knew defendant must have injured Jackson. J.B., when speaking with one of the doctors early on, was concerned that she may have been responsible because she accidently hit Jackson's head on the handle of his car seat. The doctor told her the handle of a car seat could not have caused Jackson's injuries. After defendant was arrested, J.B. spoke with him on the phone and he admitted that he had thrown Jackson. Defendant told J.B. that "it just happened" and "[b]lood came out" when he tried to perform CPR on Jackson.

Upon returning to the apartment to pick up some things after moving out, J.B. saw one or two holes in the walls and figured defendant had punched the walls in anger. She also received letters from defendant after Jackson died but had not read them before giving them to the police. In one letter, defendant wrote: "And how is [Jackson]? How is he? Huh? I'll take him away again from you and homeboys also.… Have the fun you want. No one will top me. You know why he's away from you?… See what happens when you cheat?" J.B. testified that she had never cheated on defendant and believed that he was taunting her.

Joel C. was defendant's neighbor, though they never spoke until September 23. At approximately 10:00 a.m. that day, defendant knocked on Joel's door, told Joel that Jackson was not breathing, and asked to use the telephone. Defendant was carrying Jackson and appeared scared. Jackson's face was a bluish color, blood came from his nose, and he appeared dead. Defendant placed Jackson on the floor on a shirt that Joel provided. Joel called 911 and reported that defendant's three-month-old son was not breathing well. Defendant performed CPR pursuant to instructions he received from the 911 dispatcher. Defendant was jerking and shaking Jackson, but Jackson did not move or make a sound.

6.

Michael Orique, then employed as an officer with the Porterville Police Department, was the first to respond to Joel's apartment at 10:25 a.m. Jackson was pale, his lips had a bluish tinge, blood was coming from his nose, and he was not moving. Paramedics arrived and took over care of Jackson. Carl Schneider had been a paramedic for five years with a private ambulance company and responded at approximately 10:29 a.m., four minutes after receiving the call. Schneider immediately placed monitors on Jackson's heart, could not find a pulse, and determined that he was not breathing. The heart monitor indicated that Jackson's heart still had a low amount of electrical activity (meaning his heart generated an electrical pulse that was insufficient to cause the heart muscle to pump) but he was in cardiac arrest.

Schneider continued CPR and then unsuccessfully attempted to intubate Jackson. Blood in Jackson's airway visually impaired Schneider's efforts to intubate, and the procedure was difficult because Jackson was only three months old. The bleeding was not active and could not have been caused by CPR attempts. By the time they arrived at the hospital at 10:47 a.m., Jackson's heart rate was at 150 beats per minute and he had a pulse. However, Jackson was not breathing without assistance.

Brett Calloway, a corporal with the Porterville Police Department, also responded to Joel's apartment. Defendant told Corporal Calloway that he had had been sleeping on the couch and woke up when he realized that Jackson was having trouble breathing. Defendant said that he attempted CPR on Jackson and then noticed Jackson bleeding from his nose. Corporal Calloway drove defendant to the hospital.

Matthew Green was a detective with the Porterville Police Department and interviewed both defendant and J.B. at the hospital on the day Jackson was admitted. Defendant told Detective Green that Jackson had been coughing and gagging for several days prior. That day, defendant was home with Jackson when he noticed Jackson started having breathing issues. Defendant said that Jackson had been fussy after J.B. left for work and he tried to get Jackson to sleep. To soothe Jackson, defendant put him in a

7.

bouncer and fell asleep himself. He woke and heard Jackson making coughing and gurgling noises. Defendant determined that Jackson was not breathing and went to his Joel's apartment to call J.B. and 911. Unable to reach his J.B., defendant spoke with the 911 dispatcher and started rescue breathing on Jackson.

Detective Green periodically contacted the hospital to determine Jackson's status and learned that he died on October 14. Detective Green attended Jackson's autopsy on October 19. He interviewed J.B. on October 25 and interviewed defendant on October 26. Defendant's video-recorded interview was played for the jury.

### B.     Defendant's Statement to Detective Green

Detective Green gave defendant a ride to the police station on October 26, where he interviewed defendant. Defendant advised Detective Green that J.B. was the only other person who had watched Jackson before the incident. Jackson was at J.B.'s parents' house the day before, but defendant worked a lot the few days before that, so he was not home much. Defendant only noticed that Jackson was coughing up his milk when J.B. fed him before she left for work. After J.B. left, Jackson was resting on defendant's chest and defendant did not see any problems with Jackson's breathing. Thinking Jackson was asleep, defendant attempted to move to the bed to lay down, but Jackson woke and started to cry. Lately, Jackson had been crying whenever he laid on his back. Defendant picked him back up, clapped him on the back, and went to the chair with Jackson laying on his chest. Jackson stopped crying as soon as he was picked up. Defendant watched some television and then moved Jackson to his vibrating chair.

Defendant woke and heard Jackson gagging, but Jackson's eyes were closed, and his arm was dead weight when defendant lifted it. Jackson stopped gagging after making two small noises. Defendant picked Jackson up but could not detect signs of breathing and kept patting his back. Jackson's lips started turning purple. Defendant breathed into Jackson's mouth and noticed blood coming out of Jackson's nose. Defendant took

Jackson to Joel's house to use the telephone. The 911 dispatcher provided some advice as to what to do, and defendant continued performing rescue breathing until the paramedics arrived.

Jackson did not crawl yet, and he did not fall out of a chair. When Detective Green advised defendant that the doctors had indicated Jackson's head injuries were not caused by an accident, defendant asked, "Shaken baby?" Detective Green explained that defendant had not described anything that would explain Jackson's injuries, including Jackson's fractured ribs. Defendant denied shaking Jackson or doing anything like that and claimed that "everything was fine until he started choking." Defendant suggested Jackson's ribs might have been fractured when someone performed CPR on him.

Detective Green asked defendant whether he agreed with J.B. that he had been rather rough with Jackson. Defendant referred to the incident where he pulled Jackson off the boppy pillow but claimed that J.B. did not see that defendant was supporting Jackson's head at the time.

After additional conversation, defendant said, "Well, well … I don't … physically I didn't what ever [*sic*] it was I did … I didn't mean to kill him if I did it." He explained, "I didn't think I was actually being rough, I picked [Jackson] up and kind of picked him apart but it couldn't have been anything physical." He elaborated, "Don't know … I just … got him, picked him up by his arms … right here and and [*sic*] that's it, I took him in the room and I put him down like … you know … I don't want to say I was frustrated or wasn't anything like that I was just.… [¶] … [¶] He's … yeah … driving me to hell crazy but it was nothing and … nothing … I didn't … if I'm trying to say; if it was anything that I did … by putting him down I don't believe I did it rough but was nothing … I didn't mean to hurt him if I did." Defendant agreed that he picked Jackson up roughly but said, "I didn't throw him I … I … I want to say I didn't throw him … I had him I probably kind'a …," and then agreed with Detective Green who suggested, "Kind of forcefully put him on the bed?" Defendant explained that Jackson continued to cry so

9.

defendant grabbed Jackson and took him into living room and then "I don't want to say threw him but sat him down on the couch, I don't believe that was forcibly hard or anything." Defendant agreed that he sat Jackson down harder than normal but did not throw him or slam him down on the couch. Defendant then admitted that he had lied to Detective Green earlier. Defendant said that while he was rough with Jackson, he did not believe it could have caused those injuries. Defendant demonstrated how he handled Jackson using a doll and agreed he was slightly forceful but said that he did not slam Jackson on the bed or couch.

Detective Green advised defendant that a voice stress analyzer indicated that he was not telling the truth when he denied being responsible for Jackson's injuries. Detective Green asked, "There's more that happened[,] am I right or wrong?" Defendant replied, "There's more." Defendant said, "I didn't mean to kill my kid." He continued, "I … was rough with him? Yeah. Did I do the things? Yeah. I didn't … I wasn't … umm … I wasn't … I'm not in my head that I … I don't know how .…" Detective Green asked defendant to explain again what he did. Defendant responded, "That I … like … throw him … not throw him but I sat him more forcefully on the bed … yea. That I shaked [*sic*] him? I won't … yeah it wasn't more than I didn't mean to." Defendant denied "constantly" shaking Jackson, but said that he probably did shake Jackson. "[W]e went to out in the living room, I kind of like; I wouldn't say slam but I kind of forced … forcibly just threw him on .… [¶] … I don't know if slamming is the only way; yeah, I threw him on the bed." Defendant admitted that he threw Jackson "probably about 2 or 3 times."

Defendant denied being angry but agreed that he had just woken up and was frustrated by Jackson's crying. Detective Green concluded that defendant's demonstration minimized the force he used, and he was not demonstrating enough force to account for Jackson's injuries. Defendant denied shaking Jackson for "a while" but admitted doing it for "like a minute" approximately two or three different times.

10.

Defendant did not believe that he squeezed Jackson hard enough to fracture his ribs. Defendant admitted that he believed his actions caused the injuries to Jackson.

Defendant reviewed the information he provided to Detective Green and said, "He started … he started crying. So I started pacing around and I don't know … I … (Inaudible) hot headed temper but … and just … I accidentally did it .…" Defendant described that he tossed Jackson on the bed when Jackson would not stop crying and forcefully picked him up. He paced while holding Jackson who continued to cry and "you know I didn't know what else, I was just like, I couldn't … I couldn't take it so that's when I tossed him on the couch." Defendant demonstrated how he tossed Jackson. He admitted to Detective Green that he has no doubt that he was responsible for Jackson's death.

Mark Lightfoot was a detective with the Porterville Police Department and worked with Detective Green. On October 26, Detective Lightfoot assisted in arresting defendant and permitted him to make two telephone calls. During one call, Detective Lightfoot overheard defendant state, "I lost control," "I tossed him on the bed and the couch. I did not mean to," and, "I just wanted to let you know." During the second call, defendant stated, "I had something to do with it," and, "I just wanted to let you know."

### C. Jackson's Medical Condition and Cause of Death

Jackson was born on June 27, by C-section at 35.4 weeks of gestational age. A premature baby is one born before 37 weeks' gestation, so Jackson was slightly premature. Jackson was born weighing five pounds and four ounces, a normal size for his gestational age. Jackson needed breathing assistance at birth, which is not uncommon for children born by C-section, and was intubated to assist his breathing. He received a vitamin K shot to prevent a bleeding disease that might occur in premature newborns. Jackson was transferred to Valley Children's Hospital the next day. Jackson's ventilator was removed the day after he arrived at Valley Children's Hospital.

The doctors were concerned that Jackson might have respiratory distress syndrome, common in premature babies, and his liver functions indicated that he could have an infection. When they tested for meningitis, they observed Jackson's white blood count was elevated, an indication of meningitis. While waiting for test results ordered by the infectious disease specialist, Jackson was treated with antibiotics, however, the tests did not confirm the existence of any bacteria.[8]

Valley Children's Hospital performed a pediatric echocardiogram on Jackson on July 3. Because Jackson needed resuscitative efforts at birth, the test was routine to make sure Jackson's heart was beating well.[9] In addition, the test would also rule out any heart infection such as endocarditis or myocarditis. According to test results, Jackson's heart was completely normal, beating strong and with no evidence of inflammation or malformation.

An ultrasound of Jackson's brain taken on July 15 revealed only a small, three-by-one-millimeter cyst on the left side of his brain, an insignificant finding that would not be relevant to Jackson's later injuries.

Due to the intravenous antibiotic treatment, Jackson remained in Valley Children's Hospital for approximately 19 days before he was released. At discharge, Jackson weighed six pounds. Jackson's birth chart showed that he had doubled his weight over two months, which was better than the norm.

Police reports, emergency technician reports, and Jackson's medical records from September 23 show that Jackson was in full cardiorespiratory arrest, that is, he was not

---

[8]    The high white blood cell count observed during a second spinal tap, indicative of infection, could have been caused by a failed spinal tap that preceded the second test, which could have caused blood to enter the spinal fluid and generated an immune response that increased the white blood cells.

[9]    Such efforts are often needed when a baby is born by C-section because the secretions often pushed out by vaginal birth are still present and impede breathing.

breathing and his heart was not pumping blood. Jackson was intubated and never able to breath on his own again.

Jackson was diagnosed with nonaccidental trauma at Valley Children's Hospital. A September 23 CT scan of Jackson's brain showed areas of bleeding near the structure that separates his upper and lower brain, as well as along the area separating the right and left hemispheres of his brain.[10] The blood was contained within the subdural spaces in Jackson's brain, and the various ages of the blood implied that there could have been multiple episodes of bleeding. In some areas the blood was very low in density (appearing dark), implying it was older, but the bleeding at the top of Jackson's brain was very dense (appearing white) and indicated a recent injury within hours or several days of the scan.

A subsequent September 29 MRI confirmed Jackson had subdural hematomas. His subdural brain space contained hemosiderin, a substance created within a period of days when the body breaks down the blood but is observable for months or years thereafter. Dr. Fred Laningham, the radiologist who performed the scan, testified that it was extremely unlikely that the blood observed related to any bleeding that may have occurred at Jackson's birth three months earlier.

The September 23 CT scan also showed little differentiation in Jackson's white and gray brain matter, which indicated a hypoxic injury to the brain within the last several hours or days. The injury was caused by an event that caused a lack of oxygen to Jackson's brain. With this type of damage, Jackson would be "very neurologically injured" and "[p]oorly responsive to stimulation." The nature of the two separate injuries to the brain raised a suspicion of trauma.

---

**10** Bleeding from the veins into the space under the dura that covers the brain is referred to as a subdural hematoma and can be caused from being hit on the head or shaken.

Dr. John Kinnison was present when Dr. Nguyen,[11] an ophthalmologist, examined Jackson's eyes. Dr. Nguyen reported that Jackson had retinal hemorrhages in multiple layers of his retinas that extended to the outer borders of both of his eyes. Retinal hemorrhages typically begin to resolve right after the initial insult. The degree of retinal hemorrhaging present in Jackson's eyes is only caused by crushing injuries to the head, acceleration or deceleration injuries caused by repetitive motion back and forth, high-speed motor vehicle accidents, or forceful shaking in infants. Subdural hematomas are caused by the same type of events.

Dr. Kinnison conducted a child advocacy consultation regarding Jackson on September 24. He met with defendant and J.B. to obtain Jackson's history. Defendant told Dr. Kinnison that he burped Jackson after J.B. left for work and then rocked Jackson in the reclining chair. When defendant attempted to lay Jackson on his back on the bed, Jackson began crying and defendant placed him in a bouncy chair. They fell asleep but defendant awoke when he heard a gagging sound from Jackson. Defendant picked up Jackson and saw that his arm and leg were limp, he felt like a dead weight, and his pupils were small.

J.B. and defendant indicated that Jackson had not fallen recently but related an incident where Jackson's head had been banged on his car seat a week before. They also reported that Jackson had red lines on his arms and small blood blotches on other parts of his body that resembled circular lesions. J.B. advised that the lesions disappeared after she stopped administering Tylenol to Jackson. J.B. also reported that her mother had described that Jackson had, on occasion, shaken his head while his eyes were deviating upward. Jackson's parents also reported that he had been spitting up and snorting his food more than normal and also recently began crying whenever he was laid on his back.

---

[11] Dr. Nguyen's first name was not included in the record on appeal.

14.

Dr. Kinnison concluded that there was nothing in Jackson's medical history to explain Jackson's subdural hematomas or retinal hemorrhages.

The autopsy performed on Jackson's body, approximately three weeks after Jackson was injured, revealed no external signs of trauma, nor any signs of trauma to Jackson's cardiovascular or respiratory systems. The pathologist observed that Jackson's brain had healing subdural hematomas (as indicated by their yellow pigment) on both the left and right sides.[12] Both the lungs and heart were normal with no disease or other medical condition.

As part of the autopsy, a full body CT scan was performed on Jackson and revealed two fractured posterior ribs. The fractures were visible due to calluses formed as part of the healing process and extended the full width of each rib. Such injuries are difficult to observe in imaging immediately after the injury is suffered and until the calluses start to form. The pathologist concluded that Jackson died as the result of head and chest trauma.

Jackson's brain and eyes were removed, preserved, and sent to Stanford Hospital's neurology department for examination. Dr. Otto Hannes Vogel, a professor of pathology and pediatrics and director of neuropathology at Stanford University, testified that Jackson's brain exhibited two injuries—the subdural hemorrhages and a hypoxic-ischemic injury caused by lack of blood flow and oxygen—although the injuries roughly occurred at the same time. Essentially, the brain was injured and swelled to the point where it limited blood flow and oxygen. This would have caused Jackson to be in full cardiac arrest.

Jackson's dura (the thick covering of his brain) showed evidence of an old bleed that was healing and a subdural hemorrhage on both sides that was healing as well. The

---

**12** If Jackson was injured on September 23, the subdural hematoma would start to heal but stop once he died.

15.

color of the hemorrhage was consistent with a bleed underneath the dura on September 23, which would have been healing until Jackson's death on October 14.[13]

A microscopic examination of Jackson's brain tissue indicated that by the time Jackson passed away, he had lost a lot of neurons due to a lack of oxygen and blood flow to the brain. The damage seen in Jackson's brain occurs when blood stops flowing to the brain and the brain is deprived of oxygen, causing nerve cells to die. Dead neurons were also observed in his brain stem, some of which showed changes that suggested injury occurred "a little while" before actual death. There was no evidence of a viral infection in Jackson's brain. The hippocampus is benchmark for hypoxic-ischemic injury to the brain, and Jackson's brain showed extensive hypoxic-ischemic injury.

Dr. Vogel reviewed the examination reports and photographs of Jackson's eyes. Eyes connect to the brain through optic nerves, and nerves are covered by the optic sheath. Jackson's eyes showed extensive hemorrhaging in the retinas and around the optic sheath, which is significant and typical of trauma. The hemorrhages would have begun healing right away, and Jackson's eyes evidenced healing consistent with an injury on September 23.

Based upon Dr. Vogel's training and experience, the most likely cause of Jackson's brain and eye injuries was severe head trauma by blunt force injury to the head. Given Jackson was three months old at the time of injury, his injuries could only have been caused by a high-speed car accident where he was unrestrained and thrown about the car, a fall from a two- or three-story building, or another person. Dr. Vogel's review of the examination report and photographs did not indicate Jackson had a medical condition that caused the brain trauma. Dr. Vogel testified that common risk factors for

---

[13]    Dr. Vogel later testified on cross-examination that the healing exhibited by Jackson's brain would be equally consistent with a subdural hematoma on August 5 (a date selected by defense counsel), but that it would require a blunt force injury to the head to have occurred on that date.

abusive head trauma in children under one year of age include an unsettled socioeconomic situation or medical issues presented by a child chronically ill or born prematurely, which cause frustration to the parents. The most likely perpetrators of abusive head trauma to infants are the father, followed by boyfriends, then caretakes, and then mothers.

Defense counsel suggested several possible causes of Jackson's bleeding and brain damage, including acidosis—a condition where basic pH in the blood and tissues falls into the acid range as the result of shock or other metabolic conditions—and thrombocytopenia, a blood disorder characterized by a low platelet count. Dr. Vogel testified that acidosis could not have caused the kind of oxygen loss that caused Jackson's brain injury  Additionally, even though thrombocytopenia could cause a subdural hematoma, it would not be spontaneous. Dr. Vogel testified that he did not believe that thrombocytopenia caused Jackson's injuries based upon the other findings such as retinal hemorrhages, optic sheath hemosiderin-laden macrophages (healing hemorrhages), and rib fractures.

Dr. Frederic Bruhn reviewed Jackson's medical history and his parents' statements describing Jackson's condition the morning of September 23. No one indicated that Jackson sustained any accident or injury prior to when he stopped breathing. However, when admitted to the hospital, Jackson was suffering from severe neurological damage. Jackson was diagnosed with nonaccidental trauma based upon his out-of-hospital cardiac arrest, subdural hematomas, and evidence of brain injury.[14] Dr. Bruhn reviewed the September 23 CAT scan of Jackson's brain, which reflected a subdural hematoma that

---

[14]    The outside of the brain is normally gray and comprised of nerves and cells. The white area below is comprised of nerve fiber. Jackson's brain had lost differentiation between the white and gray areas, indicating injury to the brain.

17.

was fairly large and may have been both acute[15] (recent) and chronic (some bleeding occurred prior).

Dr. Bruhn reviewed the autopsy photographs and report and testified Jackson's brain, after his death and three weeks following his injury, showed a resolving subdural hematoma (as indicated by the changed color as the body is working to absorb the blood). Dr. Bruhn testified that hematomas can be found in babies at birth who are asymptomatic, but they resolve in four to six weeks. Therefore, this was not a birth injury because it was too severe for Jackson to have been asymptomatic and behaved normally for as long as he did. In addition, hematomas are less likely to occur in babies born by C-section.

Jackson was also diagnosed with multiple acute (recent) retinal hemorrhages in both eyes, too numerous to count and out to the peripheries of the retinas. Children under one year of age are more likely to have retinal hemorrhages from abusive head trauma because they have multiple layers of vitreous that get damaged. Retinal hemorrhages may occur during birth but would resolve within four to six weeks, and they are a different type of hemorrhage that does not extend to the peripheries of the retinas. An accidental cause of retinal hemorrhaging could be a severe car crash where the infant is thrown or a crush injury from a large object falling on a small child.

The autopsy also revealed two healing rib fractures that were not present during Jackson's skeletal survey performed on September 24. A fresh rib fracture will often not appear on an X-ray until the callus that forms during healing is large enough to view through the lung tissue. Dr. Bruhn reviewed an X-ray of Jackson's chest taken on October 5, the week before he died, and observed a callus on one rib, indicating a healing fracture in the right posterior sixth rib. The autopsy scan showed the same healing fracture in the right posterior sixth rib and an additional healing fracture in the left

---

**15**     Acute refers to a sudden injury or the period of time right after the injury. Chronic refers to a longer or extended length of time.

18.

posterior tenth rib. Dr. Bruhn was unable to tell precisely when the rib fractures occurred, but CPR would not usually cause posterior rib fractures nor would hospital personnel do so, and rib fractures develop calluses in five to 10 days.

Dr. Bruhn testified that he could see no evidence of a medical condition that contributed to or caused Jackson's injuries, nor did Jackson's medical issues at birth have any involvement in his injuries. While Jackson was treated with antibiotics as if he had a bacterial infection at birth, subsequent testing found no evidence of a bacteria as the cause of meningitis at birth. Dr. Bruhn testified that the cyst on Jackson's brain on July 15 was very small and insignificant and was not involved in Jackson's injuries on September 23. Dr. Bruhn also testified that Jackson's eyes appearing to deviate during the week before Jackson was hospitalized was most likely due to minor seizures from prior abuse.

Dr. Bruhn testified that Jackson's low platelet count at birth had resolved and the Valley Children's Hospital tests indicated a high platelet count, which ruled out that he had been bleeding from a lack of platelets. Results of Jackson's earlier, September 17 blood work indicated that Jackson's red blood cell count, hemoglobin (a measure of the oxygen-carrying protein in the blood), and hematocrit (the percentage of red blood cells compared to the whole plasma)[16] were low, but borderline normal for a child his age, indicating that he did not have a bleeding disorder.[17] His platelet count was high, indicating that there might have been bleeding in his body, but it would not be the cause of any bleeding.

Based on all this information, along with J.B.'s statement that Jackson was "off his game" (not eating or sleeping as usual, crying more, and eyes deviating), indicated

---

[16] Jackson's degree of hematocrit would not have caused a lack of oxygen to his tissues and would not have been significant.

[17] Jackson's blood values were not low enough to have caused a deprivation of oxygen to any of his body tissues.

19.

Jackson was suffering from a subdural hematoma at that time from chronic abuse during that period. The September 23 CT scan indicated that Jackson had both an acute hematoma and possible prior episodes of bleeding.

Dr. Bruhn concluded that Jackson's injuries were inflicted and the result of abusive head trauma. Due to Jackson's sudden collapse, Dr. Bruhn concluded that the subdural hematomas and retinal hemorrhages likely resulted from the same traumatic event. Dr. Bruhn viewed a video of defendant demonstrating the manner in which he handled Jackson prior to when Jackson stopped breathing, and Dr. Bruhn did not think that defendant's demonstration could account for Jackson's injuries. Dr. Bruhn concluded, however, that Jackson's injuries arose from severe shaking because of the lack of evidence of an impact injury. The shaking damaged Jackson's brain stem, which caused him to stop breathing, and then his heart stopped. The lack of oxygen to the brain damaged the brain, killing parts of it, and caused damage to the heart, although the heart damage began to repair itself the next day.

## II. Defense's evidence.

Dr. Steven Gabaeff worked in emergency medicine for approximately 30 years before retiring and, since then, had been practicing clinical forensic medicine. Dr. Gabaeff was part of a loose association of 200 multispecialty doctors who monitor developments in abusive head trauma or shaken baby syndrome that "work together to keep each other informed" and "to stay on the leading edge versus child abuse doctors … all with one focus of a child abuse where the diagnosis, prosecution, and testimony relate[] to child abuse."

Dr. Gabaeff reviewed Jackson's medical records, police reports, and autopsy records and prepared a report. According to Dr. Gabaeff, Jackson's birth at 35 weeks' gestation meant that he was "significantly premature" and, as a result, he would have had neurological problems, be susceptible to infection, and have weaker bones resulting in

20.

infantile rickets that are misdiagnosed as fractures. As a result of being born by C-section after a vaginal birth was attempted, the constant smashing of Jackson's head into J.B.'s pelvis would have produced retinal and subdural hemorrhages that were falsely ascribed to shaken baby syndrome when, in fact, they were related to pressure in the brain resulting from low oxygen and damage to the brain occurring during contractions. Additionally, Jackson's medical records indicated that he suffered from neonatal meningitis, which would have resulted in an immaturity of safety reflexes such that he would have lacked the ability to cough, gag, or throw up and is related to sudden death syndrome. Jackson was also treated with antibiotics that can cause brain damage. Meningitis causes bleeding in the brain and damages or destroys neurons.

Dr. Gabaeff testified that when a child loses consciousness and stops breathing, some doctors rush to judgment that it was the result of abuse when in Jackson's case, his symptoms were typical of meningitis and birth trauma that resulted in bleeding in the brain. Complications from premature birth can occur over time and manifest as rebleeding of damaged areas of the brain that occurred at birth. As pressure in the brain increases, the infant can exhibit nausea, vomit or gag, and cry inconsolably. Increased cranial pressure is also responsible for retinal hemorrhages by increasing pressure to the retinas and reducing oxygen. Shaking cannot cause retinal hemorrhages.

Dr. Gabaeff testified that Jackson had meningitis, which caused him to lose blood and become anemic. Signs of this included descriptions of Jackson becoming fussy, vomiting, displaying signs of seizures, and then, while defendant was sleeping, stopping breathing due to the pressure in Jackson's head. Dr. Gabaeff testified that Jackson's medical records showed that he suffered from myocarditis and had fluid in his lungs, all indicating that he suffered from congestive heart failure. He also had a chronic subdural hematoma from birth that continued to bleed periodically. In Dr. Gabaeff's opinion, Jackson suffered from a number of conditions that could cause bleeding and swelling in his brain and, therefore, abuse was not the cause of his condition.

21.

Dr. Gabaeff testified, "I don't believe that any child abuse took place in this case at all." According to Dr. Gabaeff, Jackson was a sick baby from the time he was born who suffered a damaging brain infection at birth and was reinfected in the weeks before his admission to the hospital; his brain infection caused increased pressure that compressed the breathing centers in his brain, and he stopped breathing. Before receiving any medical intervention, the lack of oxygen to his brain damaged his brain and resulted in brain death.

Dr. Gabaeff reviewed descriptions of defendant's description of his handling of Jackson and testified that defendant's actions were not responsible for Jackson's death because they did not cause any external trauma to Jackson, nor injure his neck. Dr. Gabaeff testified that Jackson had no injuries on September 23, except for birth-related trauma including meningitis and osteoporosis. Because Jackson did not suffer any neck damage, nothing that defendant did could have caused the damage to Jackson's brain, and a human cannot generate the force necessary to damage an infant's brain by shaking. Jackson could not have been injured by being thrown on a bed or couch.

Dr. Thomas Young testified that he had been a forensic pathologist for 30 years. Dr. Young reviewed the tissue slides prepared by doctors at Stanford Hospital from Jackson's eyes and brain. He concluded that Jackson's subdural hematomas were months old in relation to when he went into the hospital on September 23. Dr. Young testified that apart from the color of the hematomas, other changes in the brain also indicated that the damage to the brain was months to one year old. Jackson lived with a lesion in his brain for three months. Dr. Young also testified that the retinal hemorrhages were old and not significant. Dr. Young testified that Jackson's injuries were consistent with oxygen deprivation at birth and that Jackson may have suffered brain damage even before birth. Little healing of the brain would have taken place while Jackson was on the respirator, which indicated the healing process took place before September 23.

22.

Dr. Young testified that the July 15 ultrasound was not dispositive of whether Jackson suffered from subdural bleeding at birth because the ultrasound could not view all of Jackson's brain, it could only view tissue under the soft spot on Jackson's head.

Dr. Young also shared Dr. Gabaeff's opinion that a human cannot shake a baby with enough force to cause a subdural hematoma.

Maria Ruiz worked as a nutritionist with the Special Supplemental Nutrition Program for Women, Infants, and Children. As part of her work, she met with defendant twice while he was with Jackson. He appeared to be a caring father and she assisted him in learning to bottle feed Jackson.

Deborah Post, Tom Post, Jack Henry, and Marjorie Henry also testified that defendant was not a violent person.

## DISCUSSION

### I. *The trial court did not err in denying defendant's motion to exclude his statement to law enforcement.*

Defendant argues that the trial court erred in ruling that he was not in custody and entitled to advisements pursuant to *Miranda*, *supra*, 384 U.S. 436 before he was interviewed by Detective Green. He also argues that his statement was inadmissible because it was not voluntary. We reject both arguments.

#### A. Background

Defendant moved to suppress his prearrest statement both because he had not received *Miranda* warnings and because his statement was involuntary. The trial court conducted an evidentiary hearing on October 1 and October 3, 2018, and reviewed defendant's video-recorded interview with Detective Green and the transcription of the interview.

#### 1. *Defendant's Statement*

Detective Green's interview of defendant was video recorded and later transcribed. At the outset of the interview, Detective Green stated, "[Defendant], I want

23.

to remind you upfront, you're not under arrest, okay, you're free to leave. The reason that we're doing it here at the police department is so that I have my notes; if I need to look something up, I can. I don't have to worry about, you know, what's at your house and—and your business over there, okay?" Defendant replied, "Yeah." Detective Green responded, "So you're not under arrest." Detective Green also advised defendant, "And I respect your right to say, 'I don't want to answer that question.' That's your—that's your right. Okay?" He asked if defendant wanted something to drink. Detective Green then said, "This is the door. It's not locked. It's you and me in here. We're the only ones. I'm trying to set you at ease, okay?" "This is [an] interview. This is not an interrogation." "I want to make sure that you understand that you're not under arrest and that, that's not what this is about."

Defendant described the events of September 23 to Detective Green while Detective Green asked followup questions. After defendant provided the information, approximately 17 minutes into the interview, Detective Green advised defendant that the doctors had determined that Jackson's head injuries could not have been an accident. He told defendant, "[I]t's the hospital's opinion that your son was abused.… I also realize … things happen that cause injuries that look like that. [¶] … [¶] But we do need an explanation .…" Detective Green advised defendant, "[T]his is your chance to say, 'Hey this is what happened .…' " Defendant denied shaking Jackson. Detective Green reminded defendant that he was the only one home with Jackson and that he did not intend to accuse defendant "because I don't have any grounds to accuse you to do anything. That would mean you were there when this happened though." Detective Green explained that Jackson had both old head injuries and three fractured ribs. Detective Green reminded defendant, "[Y]ou didn't come down here in handcuffs. I'm not arresting you. That's not the case. You know, I don't—it doesn't need to get [to] that point. I'm honestly giving you a completely valid and legitimate chance to—to help

me understand what happened here, because your son is—your son is dead. [¶] … [¶] And—and we have to know what happened."

Defendant repeated the same description of the events preceding Jackson's admission to the hospital and claimed to be telling the truth. Detective Green asked defendant about J.B.'s statements that she believed that defendant was too rough with Jackson. Defendant explained that J.B. was mistaken. Detective Green advised defendant that the hospital's conclusion that Jackson was abused converted his death to a homicide. Detective Green told defendant that he was not accusing defendant and defendant acknowledged that he had not been accused of anything. Detective Green explained that Jackson was either intentionally injured or the victim of an accident, but defendant's explanation did not include any information that would suggest there was an accident. Detective Green explained that because defendant was with Jackson before he stopped breathing, either defendant did something intentionally or accidentally and said, "I have no reason to believe that you would intentionally have done anything …." Detective Green told defendant that his description of the events did not explain what happened to Jackson and that defendant was not telling the whole story. Detective Green expressed concern that by "not really talking to [him]," defendant was forcing Detective Green "to do something I don't want to do." Detective Green explained that he was not present when Jackson was injured and did not know what happened, but that commonsense indicated defendant was responsible either intentionally or unintentionally. Detective Green thanked defendant for coming to the police department to talk with him but explained that if defendant could not provide an explanation for Jackson's injuries, Detective Green would have to assume Jackson was murdered.

Defendant denied hurting Jackson that day or any other day. Detective Green explained that when the interview concluded it would be too late for defendant to provide an explanation and that he did not "want to arrest you. That's not why you're here, okay? I just need you to be honest with me about what happened." Defendant said that J.B.'s

family was accusing him of having done something to Jackson. Detective Green explained that the doctors believed that Jackson stopped breathing immediately after experiencing head trauma. Defendant denied any responsibility for Jackson's injuries and agreed to take a lie detector test after consulting with an attorney. Detective Green reiterated that defendant was not under arrest.

Detective Green left the room 36 minutes into the interview and when he returned,[18] he lied to defendant and said that someone had analyzed defendant's voice and determined that defendant was not telling the truth. Detective Green again reminded defendant that he was not under arrest and that he did not want it to get to that point. Detective Green explained the way in which the test worked and that if defendant was not willing to describe the accident responsible for Jackson's injuries, then Detective Green would not be able to help defendant. Detective Green stated, "[I]f the truth is that this was an accident, I can work with that." Detective Green said that he would provide another opportunity for defendant to tell the truth.

Defendant asked, "You said I'm not under arrest; right?" Detective Green responded, "You're not under arrest at this point." Defendant indicated that he needed to talk to a lawyer. Detective Green expressed concern that defendant would regret not using the interview as an opportunity to tell his side of the story. Defendant asked, "So what's—what's the worst that I'm looking at if …." Detective Green responded, "It depends on what you tell me. I just want the truth. If there—if this was an accident, accidents happen …. If you lost your temper, okay, and something happened, is that an accident or is it purposeful? It's a bad accident. It's bad, but it's still an accident. Am I right or wrong? [¶] Now, if you plot to kill him, then it's murder, okay?" Detective Green explained that he could not tell defendant "you're not gonna get in any trouble."

---

[18]     Defendant was texting on his cellular phone while Detective Green was out of the room.

26.

Detective Green told defendant, "I can tell you right now, it couldn't get any worse. By you telling me the truth, it's only to going to make things better."

Detective Green also told defendant that he did not have to talk to defendant, and he could submit the case for prosecution and obtain an arrest warrant. He continued, "You can walk out that door right now, that's your option, but if you do and it stands the way this is, it's—it's a worst-case scenario. And I'm not going to stop you. You're the one that's—that's your choice, okay?"

Detective Green stated that if defendant made the choice to finish the interview, leaving no explanation for Jackson's injuries, then "[i]t's a worst-case scenario." He added, "That's why you're down here, not so that I could arrest you. I don't need you to confess to anything. I want to know the truth, because like I—I truly believe that the truth is not as bad as these doctors are making it out to be, okay?" Detective Green repeated that defendant could walk out the door, but he believed defendant would regret it, "[a]nd—and that's not a threat. I'm—this is me talking as a person to person, okay? And it's not going to help with the healing process." He continued, "It's your choice, but if you choose, at this point, to tell what really happened, and if turns out—if it—if it is what I think it is, then we're going to deal with it, okay? But it—but it's not going to be nearly as bad as just leaving it where it is now, which you saying nothing happened."

Defendant replied, "I'm saying what I've said." Detective Green advised defendant that would be a choice that he would have to live with but not "—as a free man for the rest of your life. This case is not going away. If you walk out this door—if you walk out that door saying nothing happened, when I get enough evidence, I'm coming at you with murder, okay? That's why we're here. You had two choices. You could be a man and be honest with me and tell me what really happened, or you could lie to me, like you've done, and I will charge you with murder. That's all there is to it."

Defendant asked, "[I]f I give you an explanation and say I—say I did this and that, are you gonna accuse me of it today?" Detective Green replied that he could not answer

27.

that question until he knew what defendant intended to say. However, if defendant could not explain Jackson's injuries and walked out the door, then "I'm calling the district attorney's office and I'm sending this case over to them, and I'm going to request that they charge you with murder. [¶] And I don't have any doubts that they'll issue a warrant."

Detective Green stated that he did not believe that defendant had provided the entire truth "and the reason I'm guessing is … you think that you're gonna get in trouble, maybe you will maybe you won't I don't know. But realistically, if you do get in trouble on what ever it did [*sic*] that happened it's a lot less than murder." Defendant agreed and said that was true. Detective Green reiterated, "[Y]ou're a free man to walk out that door. You can walk out that door right now and I'll take you home okay? But like I said; the case gets submitted and I request charges of murder now, I've already talked to the DA's office, and it's not gonna be a problem … but I also told them … 'Let me talk to him first.' Before we get … before we get an arrest warrant, let me talk to him to see if he can explain this ….' "

Defendant said that whatever he did, he did not intend to kill Jackson. Then defendant agreed and said, "I'll talk." Defendant provided Detective Green with additional information that he had shaken Jackson and thrown him on the bed and couch. Detective Green indicated that the doctors would say that defendant had to have handled Jackson rougher than he was describing. Defendant replied, "I'm not saying that. I've already lied to you once about it." Detective Green left defendant a second time approximately one hour into the interview after offering defendant something to drink.[19]

When Detective Green returned a few minutes later, defendant explained that he had texted with J.B. and "just told her that I was talking with you." Detective Green told

---

**19**      While Detective Green was out of the interview room, defendant was texting on his cellular phone.

28.

defendant that a voice stress analyzer indicated that defendant was not telling the truth when he denied being responsible for Jackson's injuries. Detective Green told defendant that he believed they were making progress but that he felt defendant had not revealed everything. Detective Green asked, "There's more that happened. Am I right or wrong?" Defendant replied, "There's more." After defendant provided additional information, Detective Green asked what defendant believed the voice stress analyzer would provide as to his truthfulness. Defendant claimed not to know. Detective Green reiterated that defendant was free to go but that he believed defendant still had not been completely truthful and was only 90 percent truthful. Detective Green reviewed defendant's statement with him again. Defendant said, "I accidentally did it. All right? I—there's no lie about that."

Detective Green left the room again one and a half hours into the interview. When Detective Green returned, he offered defendant a drink, left, and returned with a cup of water. Then, Detective Green read defendant *Miranda* warnings. Defendant asked, "Is there any way I can not be arrested right now?" Detective Green advised defendant that he was under arrest, but they had not decided on the exact charges and that would depend on defendant's description of what transpired. Detective Green then reviewed with defendant the information that defendant had previously provided.

### 2. Trial Court Ruling

The trial court denied defendant's motion to exclude his statement to law enforcement, concluding that defendant was not in custody for purposes of *Miranda* and that his statement was voluntary based upon the following facts: (1) the entirety of the interview was conducted in a comfortable and relaxed environment; (2) Detective Green was not confrontational; (3) the interview was not overly long; (4) Detective Green advised defendant that he was not under arrest at the outset and several times during the interview; (5) defendant was relaxed and attentive even when Detective Green advised him that Jackson had been abused and his death was not accidental; (6) defendant

29.

acknowledged that he was not being accused of intentionally hurting his son; (7) even when Detective Green advised defendant that he did not believe defendant was being honest, Detective Green reiterated that defendant would be free to leave at the interview's conclusion; (8) Detective Green's subterfuge concerning the use of a voice stress analyzer was a permissible interview technique; (9) several times during the interview Detective Green referenced the fact that defendant could leave the interview, go home, and even offered to drive him home.

The trial court recognized that Detective Green made one implied threat that defendant would be charged with murder based on the limited information he provided, but, when left alone, defendant texted J.B. and described his situation as "just talking to" Detective Green and remained relaxed. The court found that was not a comment made by someone who believed they were being treated unreasonably or forced to say anything. The trial court concluded:

"[T]he defendant's body language throughout the entire time he talked to [Detective Green] … he was relaxed. He looked comfortable. There's no way in my mind this was an involuntary statement.

"Considering all the circumstances associated with the statement, the court finds it is not a custodial interrogation until the defendant's *Miranda* rights are given, and the court further finds the defendant's statements were voluntary." (Italics added.)

## B. Defendant Was Not In Custody When Interviewed By Detective Green and *Miranda* Warnings Were Not Necessary

### 1. *Standard of Review and Applicable Law*

On review of a trial court's decision on a *Miranda* issue, " ' "we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*." ' " (*People v. Henderson* (2020) 9 Cal.5th 1013, 1023.) When part or all of

the questioning was recorded, the facts are undisputed and we independently review the trial court's factual determinations. (*People v. Jackson* (2016) 1 Cal.5th 269, 339.)

To protect a suspect's Fifth Amendment right against self-incrimination, *Miranda* requires that, before a custodial interrogation, law enforcement must advise a suspect of the right to remain silent, that any statement made can be used against him or her in a court of law, that the suspect has the right to the presence of an attorney, and that if he or she cannot afford an attorney, one will be appointed. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1085–1086.) "A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case." (*People v. Jackson*, *supra*, 1 Cal.5th at p. 339.)

*Miranda* applies only to custodial interrogations, and whether a person is in custody hinges on whether a reasonable person in her or his shoes would feel free to leave. (*Miranda*, *supra*, 384 U.S. at p. 444; *Howes v. Fields* (2012) 565 U.S. 499, 508–509.) There is no dispute that the interview here was an "interrogation," which is defined as express questioning or other words and actions on the part of law enforcement that law enforcement should know are reasonably likely to elicit an incriminating response from a suspect. (*Rhode Island v. Innis* (1980) 446 U.S. 291, 299–301.)

"An interrogation is custodial, for purposes of requiring advisements under *Miranda*, when 'a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way.' [Citation.] Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest. [Citations.] When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his [or her] situation." (*People v. Moore* (2011) 51 Cal.4th 386, 394–395 (*Moore*).) The inquiry is objective; it does not depend "on the subjective views harbored by either the interrogating officers or the person being questioned." (*Stansbury v. California* (1994) 511 U.S. 318, 323.)

All the circumstances of the interrogation are relevant to determining whether it was custodial.  (*Moore*, *supra*, 51 Cal.4th at p. 395.)  "No one factor is dispositive.  Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162 (*Aguilera*).)  The most relevant circumstances typically include:  "whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation." (*Ibid.*)

### 2.      *Analysis*

The circumstances of the interview in this case did not amount to a restraint on defendant's freedom of movement tantamount to a formal arrest.  Detective Green met with defendant alone.  The interview took place in a comfortable room with children's toys, a child's table, a chair, a wall painting, a plant in the corner, and the couch on which defendant sat.  Although Detective Green initiated contact with defendant, defendant voluntarily agreed to speak to him and went to the police station for the interview on his own volition.  Defendant was not handcuffed or otherwise restrained.  At the outset of the

32.

interview, Detective Green reminded defendant that he was not under arrest, he was free to leave, and that the door to the interview room was not locked. Defendant verbally acknowledged this information at the outset of the interview, and several times during the interview.

Approximately 24 minutes into the interview, Detective Green again reminded defendant that he had not been brought to the station in handcuffs and Detective Green was not arresting defendant. Detective Green reminded defendant that he was not being accused of anything, and defendant acknowledged that fact. Approximately 30 minutes into the interview, Detective Green thanked defendant for coming to the police department to talk with him and advised defendant that in the absence of any other explanation, Detective Green would conclude Jackson was murdered. Detective Green advised defendant that Detective Green did not want to arrest defendant and asked for an explanation. Detective Green reiterated that defendant was not under arrest before leaving defendant alone in the interview room.

When Detective Green returned to defendant, he used a "ruse" and told defendant that his voice was being analyzed and the test indicated defendant was not telling the truth. He reminded defendant several more times that he was not under arrest. Forty-five minutes into the interview, Detective Green reminded defendant that defendant did not have to talk to him and could walk right out the door "right now." Detective Green said that he would not stop defendant from doing so and it would be defendant's choice. Detective Green advised defendant that he would submit the case for prosecution and seek an arrest warrant but repeated that he would not arrest defendant and defendant could walk out the door without saying anything else. Detective Green told defendant that the case would not go away and, when he acquired the evidence, he would charge defendant with murder. Detective Green advised defendant 50 minutes into the interview that defendant was free to walk out the door and he would take defendant home.

Defendant was not physically restrained during the approximately two-hour interview and could have left at least three times when Detective Green left the room, but defendant did not. Each time Detective Green left the room, defendant remained seated on the couch and freely used his cellular phone. The second time Detective Green left, defendant advised Detective Green that defendant had texted J.B. that they were "just talking." Defendant exhibited his awareness that he was not in custody when Detective Green returned to the room a third time and indicated that he would be reading defendant *Miranda* warnings and defendant responded, "Are arresting me today?"

The interview was fairly long, approximately one hour and 40 minutes before *Miranda* warnings were eventually provided. However, it was not particularly intense or confrontational, and the Supreme Court has upheld as noncustodial an interview that was one hour and 45 minutes. (*Moore*, *supra*, 51 Cal.4th at p. 402.) Throughout the entire interview, Detective Green spoke with defendant in a low tone. Even when Detective Green was explaining the nature of Jackson's injuries and that they had been inflicted by someone, he was not aggressive, confrontational, or otherwise accusatory with defendant. Detective Green offered his opinion that defendant had not hurt Jackson intentionally and stated that he just wanted information as to what happened to Jackson. On balance, the totality of the circumstances here does not render the interview custodial.

Defendant argues that he requested an attorney four separate times and this indicates that the interview was coercive and custodial. However, the transcript indicates that defendant advised Detective Green that defendant wanted to obtain an attorney and consult with the attorney before agreeing to take a lie detector test, and defendant confirmed that with Detective Green a second time during the same discussion. Defendant referenced that he wanted to speak to an attorney a few minutes later, when Detective Green advised defendant that he believed defendant was holding something back. We do not agree that defendant's references to an attorney indicated either that defendant believed that he was in custody or that the interview was coercive.

34.

Defendant's reference to an attorney also immediately followed a comment by Detective Green that defendant was not arrested and implicitly reflected the belief that defendant would free be to hire his own attorney after freely leaving the interview.

Defendant relies upon *Aguilera*, *supra*, 51 Cal.App.4th 1151 and *People v. Saldana* (2018) 19 Cal.App.5th 432 (*Saldana*) to argue that a reasonable person would not feel free to leave the interview until the detective was satisfied with defendant's answers. Both cases are distinguishable from defendant's case.

In *Aguilera*, the police went to Aguilera's house and asked him and his mother if Aguilera would talk to them at the station about a killing. (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1159.) However, once at the station, the circumstances in *Aguilera* were very different. The police conducted an interrogation that was "intense, persistent, aggressive, confrontational, accusatory, and, at times, threatening and intimidating." (*Id*. at p. 1165.) The court concluded that the officers conveyed to Aguilera the message that he would be interrogated until he admitted his involvement in the crime. (*Id*. at p. 1163.) That did not happen here. Nothing Detective Green said or did up until he gave the *Miranda* advisement gave the impression that defendant was not free to leave.

Defendant contends *Saldana*, *supra*, 19 Cal.App.5th 432, compels the opposite conclusion. In *Saldana*, defendant Saldana was a 58-year-old immigrant with a sixth-grade education. (*Id*. at p. 436.) Saldana agreed to an interview at the police station after a detective left a card at his home. (*Id*. at pp. 436, 441.) The detective advised Saldana that he was not under arrest and could leave the interview room through the unlocked door. (*Id*. at p. 442.) For about 38 minutes, the detective alternated between minimizing the severity of the alleged conduct and accusing Saldana of engaging in inappropriate sexual conduct with three girls and falsely stated that the girls' clothing was being tested

for DNA.[20] (*Id*. at pp. 443–447.) Saldana unequivocally and repeatedly denied the accusations before eventually admitting that he touched the girls. (See *ibid*.)

The court concluded the interview was custodial and emphasized the "unrelenting number of accusatory questions" the detective posed, as well as the "persistent, confrontational, and accusatory" manner in which he posed them; Saldana's repeated denials; the detective's insistence on "the 'truth' until Saldana told him what he sought"; Saldana's trial testimony that he did not feel free to leave until he confessed; and Saldana's arrest at the conclusion of the interview. (*Saldana*, *supra*, 19 Cal.App.5th at pp. 456–461.)

While there are some factual similarities, there are also differences that render the case distinguishable. Unlike the detective in *Saldana*, Detective Green did not pepper defendant with an "unrelenting number of accusatory questions," nor did Detective Green employ a confrontational or accusatory manner. He used a calm, nonaggressive tone throughout the interview. (See *Aguilera*, s*upra*, 51 Cal.App.4th at p. 1164 ["whether the questioning was brief, polite, and courteous or lengthy, aggressive, confrontational, threatening, intimidating, and accusatory" is "highly significant" in considering the issue of custody].) He engaged in friendly conversation with defendant at the beginning of the interview and built rapport with him throughout by maintaining a nonconfrontational tone. Rather than vehemently and repeatedly denying accusations, defendant responded quietly and unemotionally while Detective Green was talking to him. Defendant also felt sufficiently comfortable to use his cellular phone to send text messages, and Detective

---

**20** "The officer's false statement about having discovered Mathiason's fingerprints at the scene was found by the Supreme Court of Oregon to be another circumstance contributing to the coercive environment which makes the *Miranda* rationale applicable. Whatever relevance this fact may have to other issues in the case, it has nothing to do with whether respondent was in custody for purposes of the *Miranda* rule." (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495–496.)

Green left defendant alone at least three times. Defendant, unlike Saldana, never testified that he felt he would not be freed unless he confessed.

The interview here was conducted by a single, nonconfrontational officer in an interview room, and Detective Green minimized the egregiousness of defendant's conduct and did not insult him. There is no indication that Detective Green prevented defendant from leaving during that time, or at any other point in the interview. Moreover, unlike the detective in *Saldana*, Detective Green did not qualify his statements that defendant was free to leave with an "ominous" "you will not be arrested 'right now.'" (*Saldana*, *supra*, 19 Cal.App.5th at p. 457.) To the contrary, Detective Green was clear that defendant did not have to provide an explanation of Jackson's injuries. While Detective Green did advise defendant that he would seek an arrest warrant for defendant in the future at the conclusion of his investigation, he used an apologetic tone and made clear that those actions would take place in the future. Moreover, "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." (*Stansbury v. California*, *supra*, 511 U.S. at p. 325.) Most importantly, Detective Green at no time told or even insinuated that defendant was unable to leave unless he told Detective Green what Detective Green wanted to hear.

"Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." (*Oregon v. Mathiason*, *supra*, 429 U.S. at p. 495.)

Defendant's freedom was not so restrained that the interview was tantamount to an arrest. Accordingly, the trial court did not err in concluding that the interview was not custodial and *Miranda* warnings were not required.

### C. Defendant's Statement to Detective Green Was Voluntary

#### 1. Standard of Review and Applicable Law

"When a defendant challenges the admission of a statement on the grounds that it was involuntarily made, the state bears the burden of showing by a preponderance of the evidence that a defendant's statement was, in fact, voluntary. [Citation.] On appeal, we accept the trial court's factual findings as to the circumstances surrounding the confession, provided they are supported by substantial evidence, but we review de novo the ultimate legal question of voluntariness." (*People v. Battle* (2021) 11 Cal.5th 749, 790.) "The facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded, making the issue subject to our independent review." (*People v. Linton* (2013) 56 Cal.4th 1146, 1177 (*Linton*).)

We consider a statement involuntary—and thus subject to exclusion under the Fifth and Fourteenth Amendments to the United States Constitution—if it is the product of "coercive police conduct." (*People v. Williams* (2010) 49 Cal.4th 405, 437.) We evaluate the totality of the circumstances to determine "whether the defendant's ' "will has been overborne …" ' by coercion." (*Id*. at p. 436.) The presence of police coercion is a necessary, but not always sufficient, element. (See *ibid*.)

We also consider other factors, such as the location of the interrogation, whether the interrogation was repeated or prolonged, and the defendant's maturity, intelligence, education, physical condition, and mental health. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226; *People v. Dykes* (2009) 46 Cal.4th 731, 752 (*Dykes*); *Linton*, *supra*, 56 Cal.4th at p. 1178.) We also consider whether the defendant was deprived of food or

sleep and whether the officers made threats, direct or implied promises, or used deceptive practices. (*Dykes*, at p. 752.)

The Supreme Court has found a confession not " 'essentially free' " when a suspect's confinement was physically oppressive, invocations of his or her *Miranda* rights were flagrantly ignored, or the suspect's mental state was visibly compromised. (*People v. Spencer* (2018) 5 Cal.5th 642, 672 (*Spencer*), quoting & citing *People v. Neal* (2003) 31 Cal.4th 63 (*Neal*); *People v. McClary* (1977) 20 Cal.3d 218, overruled on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 509–510 fn. 17; *People v. Hogan* (1982) 31 Cal.3d 815, overruled on other grounds in *People v. Cooper* (1991) 53 Cal.3d 771, 836.)

### 2.    Analysis

We are not persuaded the circumstances of defendant's interview demonstrate his statement was coerced. We have watched the lengthy video and are convinced that no police coercion occurred and Detective Green did not overbear defendant's will.

As the Supreme Court did in *Spencer*, we begin by noting certain factual predicates missing from defendant's involuntariness claim. (*Spencer*, *supra*, 5 Cal.5th at p. 672, citing *People v. Holloway* (2004) 33 Cal.4th 96, 114.) Defendant makes " 'no claim of physical intimidation or deprivation' " and " 'no assertion of coercive tactics other than the contents of the interrogation itself.' " (*Ibid.*) In *Spencer*, the court contrasted these facts with *Neal*, *supra*, 31 Cal.4th 63, "a case in which we held the confession involuntary, in part, because the defendant 'was placed [overnight] in a cell without a toilet or a sink,' 'did not have access to counsel or to any other noncustodial personnel,' 'was not taken to a bathroom or given any water until the next morning,' and 'was not provided with any food until some time following the third interview, after more than 24 hours in custody and more than 36 hours since his last meal.' " (*Spencer*, at p. 672, quoting *Neal*, at p. 84.)

The two-hour interview was not unduly long, and defendant never asked for it to stop. No physical punishment occurred, and defendant was not deprived of food or sleep. Detective Green did not subject him to either repeated or prolonged questioning. The nature of the questioning and the length of this interview do not establish that defendant's will was overborne. (See *Dykes*, *supra*, 46 Cal.4th at p. 752.) Detective Green was polite and did not threaten defendant in exchange for his admissions. The questioning was not abusive and defendant had three breaks, was offered drinks, and was permitted to use his cellular phone. Nothing in the video indicates that defendant felt coerced in the constitutional sense of the term at any time while he was being questioned.

Like *Spencer*, "[w]e also find significant [Detective Green]'s conduct, and [defendant]'s response to it." (*Spencer*, *supra*, 5 Cal.5th at p. 673.) As in *Spencer*, while Detective Green confronted defendant, he did so by gradually obtaining more incriminating details and refrained from "vituperative statements," name-calling, any obvious strong-arm tactics, and "base appeals to [defendant]'s deeply held beliefs." (*Ibid.*) As in *Spencer*, defendant "gave coherent, responsive answers and did not appear excessively fearful or distressed." (*Ibid.*) Similarly, defendant "also had the wherewithal to articulate—time and again—a version of events that minimized his involvement," before finally admitting that his actions caused Jackson's death. (*Ibid.*)

*Spencer* also rejected any conclusion that certain interrogation techniques amounted to coercion. (*Spencer*, *supra*, 5 Cal.5th at p. 674.) Confronting a defendant with inconsistencies in his statement is "not an improper interrogation technique, as an interrogation may include ' "exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect." ' " (*Ibid.*; see *Linton*, *supra*, 56 Cal.4th at p. 1178 [officers can exhort a suspect to tell the truth and repeatedly express that they believe a suspect is lying]; *People v. Williams*, *supra*, 49 Cal.4th at p. 444 [officers can engage in vigorous, and repetitive questioning of suspects meant to ascertain a defendant's involvement in crimes].) This is

especially so where the officer's exhortations and persistent questions are relatively "low key" as they were in this case. (*Linton*, at p. 1178.)

Unlike *Spencer*, defendant did not receive *Miranda* warnings. However, we find warnings were not necessary in this case because defendant was not in custody, and we reject defendant's argument that Detective Green ignored defendant's "invocation" of his right to counsel. As we have already discussed, defendant indicated that he wished to retain counsel for advice before submitting to a lie detector test and, therefore, we do not agree that defendant was seeking counsel for the interview. Unlike *Neal*, this was not a case where defendant was advised of his rights, invoked them but, nonetheless, officers disregarded the request. (See *Neal*, *supra*, 31 Cal.4th at p. 74.) As the Supreme Court noted in *Spencer*, "[t]hese missing elements distinguish Spencer's case from those where we have found the confession to be involuntary." (*Spencer*, *supra*, 5 Cal.5th at p. 673; see *id*. at p. 672 ["suspect invoked both his right to remain silent and his right to counsel—the latter ' "probably" "7 to 10 times" '—only to be deliberately ignored so that the detective could 'obtain a statement' "], distinguishing *Neal*, at p. 74.)

Although the detective in *Spencer* raised the possibility of the death penalty, "the statement was made in isolation and Spencer did not appear cowed by the remark." (*Spencer*, *supra*, 5 Cal.5th at p. 675.) The Supreme Court reiterated that, "a constitutional violation will be found 'only where the confession results directly from the threat such punishment will be imposed if the suspect is uncooperative, coupled with a "promise [of] leniency in exchange for the suspect's cooperation." ' " (*Ibid*.)

Defendant argues that Detective Green promised leniency four times by: (1) promising defendant that while he would get in trouble, telling the truth would make things better; (2) assuring defendant that the truth was not as bad as murder; (3) advising defendant telling the truth would mean defendant was in less trouble than murder; and (4) telling defendant if he was sorry for his mistake he, could be forgiven. However, defendant fails to place these comments in context. Throughout the interview, Detective

41.

Green explained to defendant that doctors would testify that Jackson's injuries came from abuse and responsibility for the injuries would fall on defendant because he was the last individual with Jackson before he was injured. Detective Green indicated that he was attempting to determine if the injuries were accidental or intentional and, without defendant's input, it appeared that Jackson had been murdered.

In this context, Detective Green said, "I'm not a doctor, but I'm guessing that the truth, if I got the truth out of you on what happened, it's not as bad as these doctors are going to make it out to be." In response to defendant's question as to the worst he was "looking at," Detective Green said that it would depend on defendant's explanation, he could not promise defendant would not be in trouble, but that an accident was not as bad as if he acted intentionally. Then Detective Green stated, "it couldn't get any worse by you telling me the truth it's only gonna make things better." Detective Green added a few sentences later, "But something happened that caused his injuries, and that's all I'm asking, what is that something? And then I have to decide, I have to talk to my boss, is it criminal or is it accidental? But you're telling me nothing now." In light of these comments, defendant would not have understood Detective Green to have promised that defendant would not be charged with murder. In *Spencer*, the Supreme Court concluded that the officer's suggestion that the crime was an accident did not amount to a promise of leniency and was a permissible interrogation tactic, specifically in light of the officer's express statement that he could not make any promises. (*Spencer*, *supra*, 5 Cal.5th at p. 675.)

Defendant also argues that Detective Green combined promises of leniency with threats. While Detective Green did say that he believed defendant would regret not providing more of an explanation, he qualified the statement by adding "that's not a threat.… And it's not going to help with the healing process." Detective Green explained to defendant that he was looking at a murder charge and this was his opportunity to explain what happened. Detective Green explained that if he did not

42.

receive any information to the contrary, he would submit the case for prosecution when the investigation was complete (not at the conclusion of the interview) and request a charge for murder. However, Detective Green never suggested that if defendant confessed, he would not be charged with murder. The law is clear that " 'mere advice or exhortation by police that it would be better for the accused to tell the truth' " does not render a subsequent confession involuntary. (*People v. Holloway*, *supra*, 33 Cal.4th at p. 115; see *People v. Carrington* (2009) 47 Cal.4th 145, 172 ["[W]hen law enforcement officers describe the moral or psychological advantages to the accused of telling the truth, no implication of leniency or favorable treatment at the hands of authorities arises"]; *People v. Orozco* (2019) 32 Cal.App.5th 802, 820 ["Law enforcement does not violate due process by informing a suspect of the likely consequences of the suspected crimes or of pointing out the benefits that are likely to flow from cooperating with an investigation."].)

Additionally, Detective Green's false representation regarding the use of voice analysis to detect defendant was lying does not warrant a finding of involuntariness " '[w]here the deception is not of a type reasonably likely to procure an untrue statement.' " (*Spencer*, *supra*, 5 Cal.5th at p. 675 [finding no error in officer's false representation that the defendant's fingerprints were found at scene]; see also *People v. Smith* (2007) 40 Cal.4th 483, 506 [representation that fake " 'Neutron Proton Negligence Intelligence Test,' " detected gun powder residue on the defendant's hands was not so coercive that it tended to produce a statement that was involuntary or unreliable].)

Defendant's reliance on *In re Elias V.* (2015) 237 Cal.App.4th 568 is misplaced. In that case, the detective isolated the child suspect in a room to interrogate him, posited guilt as a fact, invented false evidence, and offered two explanations or false choices for the child to choose from. (*Id*. at pp. 580–587.) The court found such techniques coercive when used against juveniles. (*Id*. at pp. 587–591.) Defendant has provided no authority that this case should be extended to adults. Defendant presents as a mature and

intelligent man and never appears cowed or browbeaten.  At one point in the interview, defendant asked Detective Green questions regarding the trouble he faced if he made admissions and whether he would be arrested that day if he told the truth.  This strongly suggests that defendant was aware of his control over the information he wanted to provide.  (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 58 [a defendant's calculation on what information to provide demonstrates a will not overborne by official coercion].)

Defendant was 25 years old when interrogated and the record gives no reason to suspect he suffered from any physical or mental disability, or that his mental acuity was lacking.  At no point during the interrogation did defendant appear physically or emotionally distressed.  (See, e.g., *Spencer*, *supra*, 5 Cal.5th at p. 673.)  Defendant's " 'physical state' and 'personal characteristics' do not strike us as sufficient bases to disturb the trial court's decision to admit his confession." (*Id*. at p. 676 [rejecting claim that the defendant's cough diminished his mental faculties or made him especially vulnerable to officer's questioning], quoting *Dykes*, *supra*, 46 Cal.4th at p. 753 ["rejecting the defendant's claim that 'his decision to confess was based upon his youth and his absence of experience with the criminal justice system' since 'there was no indication of police exploitation of these circumstances' "].)

Based on the totality of the circumstances, the prosecution met its burden of establishing by a preponderance of the evidence that defendant's statement was voluntary.  We reject any assertion that Detective Green brought influences upon defendant that overcame his will to resist.  Both defendant's characteristics and the details of this interview establish that his confession was free of coercion.  Accordingly, defendant's interview was admissible at his trial, and the trial court did not err in denying defendant's motion to exclude or suppress his statement.

## II. *The evidence is sufficient to prove that defendant acted with malice when he inflicted the injuries that killed Jackson.*

Defendant argues that his conviction for second degree murder is not supported by sufficient evidence that he acted with implied malice when he killed Jackson.

### A. Standard of Review and Applicable Law

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60; see *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320 [applying same standard when reviewing the sufficiency of the evidence under federal due process principles].) " 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.) The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. (*People v. Cravens* (2012) 53 Cal.4th 500, 507 (*Cravens*).)

"Murder is the unlawful killing of a human being … with malice aforethought." (§ 187, subd. (a).) "Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." (*People v. Knoller* (2007) 41 Cal.4th 139, 151.) "[M]alice may be express or implied."

45.

(§ 188, subd. (a).) "[It] is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (*Id.*, subd. (a)(1).) It is "implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' [Citation.] In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*Knoller*, at p. 143.) Implied malice has " 'both a physical and a mental component. The physical component is satisfied by the performance of "an act, the natural consequences of which are dangerous to life." [Citation.] The mental component is the requirement that the defendant "knows that his conduct endangers the life of another and … acts with a conscious disregard for life." ' " (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.)

## B. Analysis

Defendant argues that the evidence was insufficient to prove that he acted with malice when he caused Jackson's death. Viewing the record in the light most favorable to the verdict, we disagree and conclude the evidence was sufficient to support a determination that defendant acted with a conscious disregard for human life.

Here, J.B. testified that Jackson had been born approximately two weeks prematurely and had to stay in the hospital for approximately 19 days. Defendant was aware of this as J.B. testified that defendant visited the hospital and they lived together. Jackson was six pounds when released from the hospital and approximately 12 pounds when he was injured. Given these facts, defendant would have been aware that Jackson was fragile and regarded gentle handling. J.B. testified that she and defendant fought several times concerning defendant's rough handling of Jackson. She testified defendant had picked Jackson up by his feet and caused Jackson's head to snap back. J.B. left the

apartment and stayed with her parents for several days because she was so upset by defendant's actions.

During his interview with Detective Green, defendant confirmed that he had fought with J.B. over his rough handling of Jackson several times. Defendant explained to Detective Green that J.B. was mistaken and did not see that he was actually supporting Jackson's head. By making this claim, defendant demonstrated his awareness that Jackson required gentle handling and support for his head. Defendant also demonstrated knowledge that rough handling of Jackson could seriously injure Jackson when discussing Jackson's injuries with Detective Green. Detective Green told defendant that the doctors believed Jackson's injuries were caused by abusive head trauma, and defendant asked whether they were referring to "shaking," exhibiting defendant's awareness that shaking could cause Jackson serious injury.

In addition, J.B. also testified to other incidents whereby Jackson was harmed while in defendant's care, including a cut on Jackson's cheek and bruises on his body. Defendant specifically admitted bruising Jackson's wrist when he swaddled Jackson too roughly. J.B. testified that she and defendant fought several times when she told defendant that he was handling Jackson too roughly. These incidents all established that defendant was on notice of Jackson's delicacy.

As the prosecution experts testified, Jackson was a healthy child when released from the hospital three weeks after his birth, showing no signs of any brain injury or any respiratory or heart problems. Yet two weeks after J.B. started leaving Jackson in defendant's care, Jackson started showing signs of abuse, such as bruises and a cut on his cheek. J.B. testified that Jackson was fine when she left for work on September 23. However, within a few hours, Jackson stopped breathing, was limp, turned blue, and required emergency services. He stopped breathing and was diagnosed with bilateral retinal hemorrhages, subdural hematomas, and two broken posterior ribs. The prosecution experts testified that Jackson's injuries were unrelated to his premature birth

47.

and not caused by any medical condition. The prosecution experts further testified that Jackson's subdural hematomas and the degree and type of his retinal hemorrhaging could only have been caused by a crushing injury to the head, a high-speed car accident where Jackson was unrestrained and thrown about the car, a fall from a two- or three-story building, or another person. Such acts obviously are dangerous to the life of a three-month-old baby. These experts concluded that Jackson was the victim of abusive head trauma caused by another person.[21] Defendant was caring for Jackson when he was injured and was the only individual who could have caused the injuries.

Moreover, defendant confessed that he shook Jackson two or three times and threw Jackson down on both the bed and couch. While the prosecution experts testified that the force of the shaking and throwing as described by defendant was not sufficient to have caused Jackson's injuries, the jury could have reasonably concluded that defendant minimized the force he described applying to Jackson. The severity of the injuries inflicted on Jackson—the retinal hemorrhaging, rib fractures, and the bleeding in the brain—indicate that defendant acted with a conscious disregard for Jackson's life. Defendant told Detective Green that Jackson's crying angered, frustrated, and drove him crazy. His repeated lies that concealed and minimized his harsh treatment of Jackson indicate defendant knew his conduct endangered Jackson's life.

The subjective component of implied malice "requires only that a defendant acted with a ' "conscious disregard for human life." ' " (*People v. Knoller*, *supra*, 41 Cal.4th at p. 157.) We conclude a jury could find that an adult male throwing and shaking a three-month-old infant with sufficient force to fracture two ribs and cause hemorrhaging in the retinas and beneath the dura layer in the skull acted with the requisite mental state needed

---

[21] We note there was also evidence that in the weeks preceding Jackson's life-threatening injuries, J.B. and her mother noticed that Jackson did not like to sleep on his back, spit up his milk more, and stared into space. One expert testified that Jackson may have been suffering from subdural hemorrhaging caused by an earlier trauma to him, especially given evidence of a prior resolving hematoma when admitted to the hospital on September 23.

to support a conviction for second degree murder. The "jury was entitled to infer defendant's subjective awareness that his conduct endangered [Jackson's] life from the circumstances of the attack alone, the natural consequences of which were dangerous to human life." (*Cravens*, *supra*, 53 Cal.4th at p. 511.) Defendant argues, without citation to authority, that when the conduct does not inherently show awareness of the risk to human life, the prosecution must present evidence of defendant's prior experiences to provide evidence of defendant's awareness that his conduct poses a danger to human life. We disagree that defendant would not have been aware of the danger to Jackson's life inherent in shaking or throwing him with the degree of force needed to cause his injuries. Infliction of such serious, and ultimately fatal, injuries to a three-month-old baby, particularly after defendant had been warned to be more careful with him, cannot be reconciled with an absence of malice.

We conclude that the evidence was sufficient to support the jury's finding that defendant acted in conscious disregard to Jackson's life when defendant shook and threw Jackson with force equivalent to a high-speed car accident.

### III. *The trial court did not err in failing to instruct the jury on the lesser included offense of involuntary manslaughter.*

The trial court refused defendant's request that it instruct the jury as to the lesser included offense of involuntary manslaughter. Defendant contends the trial court violated his constitutional rights to due process and a jury trial by refusing to instruct on involuntary manslaughter. We conclude that such an instruction was not supported by the evidence in this case and, if it should have been given, any error was harmless.

#### A. **Standard of Review and Applicable Law**

The trial court possesses a duty to instruct on all lesser included offenses " 'when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).)

49.

However, "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could … conclude[]" ' that the lesser offense, but not the greater, was committed." (*Id*. at p. 162, first bracketed insertion added.) Whether or not a reasonable jury could have so concluded based on the evidence in this case is a matter we determine de novo. (See *People v. Cole* (2004) 33 Cal.4th 1158, 1215.)

As previously stated, murder is "the unlawful killing of a human being … with malice aforethought." (§ 187, subd. (a).) "[M]alice may be express or implied." (§ 188, subd. (a).) "Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger." (*People v. Elmore* (2014) 59 Cal.4th 121, 133.) Involuntary manslaughter is a lesser included offense of murder. (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30 (*Brothers*).)

Section 192, subdivision (b) provides that involuntary manslaughter is an unlawful killing, without malice, that occurs "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." The Supreme Court has interpreted "unlawful act" in section 192, subdivision (b) as (1) an unlawful act constituting a misdemeanor that, whether or not the act is inherently dangerous, is dangerous to human life or safety under the circumstances of its commission (*People v. Cox* (2000) 23 Cal.4th 665, 670); (2) an unlawful act that is a noninherently dangerous felony that is dangerous to human life or safety under the circumstances of its commission and is committed without due caution and circumspection (*People v. Burroughs* (1984) 35 Cal.3d 824, 835, overruled on other grounds *People v. Blakeley*

50.

(2000) 23 Cal.4th 82, 88–91); or (3) an unlawful act that is an inherently dangerous assaultive felony where there is no intent to kill or conscious disregard for life (*People v. Bryant* (2013) 56 Cal.4th 959, 974 (conc. opn. of Kennard, J.)).  In such cases, the crime cannot be second-degree felony murder because that theory of culpability is inapplicable to assaultive felonies, nor can it be voluntary manslaughter which also still requires either an intent to kill or conscious disregard of life.  (See *Brothers*, *supra*, 236 Cal.App.4th at pp. 31–34.)  "Accordingly, an instruction on involuntary manslaughter as a lesser included offense must be given when a rational jury could entertain a reasonable doubt that an unlawful killing was accomplished with implied malice during the course of an inherently dangerous assaultive felony."  (*Id*. at p. 34.)

### B.    Analysis

#### 1.    *The Trial Court Did Not Err In Failing To Instruct On Involuntary Manslaughter*

Defendant has not identified the theory of involuntary manslaughter applicable to his case.  We assume for purposes of analysis that assault on an infant is an inherently dangerous assaultive felony.  The question, therefore, is whether or not a rational jury could have had reasonable doubt that defendant acted with implied malice.  Defendant argues such a jury could have had reasonable doubt that he was subjectively aware of, and consciously disregarded, the danger to human life created by his use of force on Jackson that caused Jackson's injuries.  In response, the People argue that forcefully and angrily shaking and throwing Jackson establishes a conscious disregard for Jackson's life. We agree with the People's argument.

We conclude that there was no substantial evidence of the absence of malice to warrant an involuntary manslaughter instruction.  (See *Brothers*, *supra*, 236 Cal.App.4th at pp. 31–34.)  While it is possible that defendant was subjectively unaware that such forcible shaking or throwing of an infant placed Jackson's life in danger, a possibility is not sufficient to require instruction on involuntary manslaughter.  Rather, there must be

some substantial evidence supporting the theory that defendant was not in fact aware of such an obvious danger. (See *Breverman*, *supra*, 19 Cal.4th at p. 162 [instructions on a lesser included offense are required only when there is substantial evidence that the defendant is guilty of the lesser offense and not the greater offense].) Defendant has pointed this court to no such evidence, nor have we found any on our own. (See *People v. Evers* (1992) 10 Cal.App.4th 588, 597 (*Evers*) [no evidence of any reason why the defendant did not understand the risk his actions posed to child's life].) While defendant told Detective Green that he did not intend to seriously harm or kill Jackson, a defendant's self-serving statement denying an intent to kill do not constitute substantial evidence warranting an instruction on involuntary manslaughter. (*Id*. at pp. 597–598.)

Defendant argues that there is no evidence that he was subjectively aware of the danger. However, as we have noted, the jury was entitled to infer defendant's subjective awareness that his conduct endangered Jackson's life from the circumstances of the attack alone, the natural consequences of which were dangerous to human life. (*Cravens*, *supra*, 53 Cal.4th at p. 511; see *People v. James* (1998) 62 Cal.App.4th 244, 277–278 [recognizing that implied malice is often established circumstantially.].)

More importantly, in this context, we look to see if there is substantial evidence that defendant was not aware of the risk to Jackson's life by his conduct. It was not an act of simple shaking that resulted in defendant's culpability for murder. As the prosecution experts testified, defendant would have had to shake Jackson with force equivalent to falling from a two- or three-story building or being in a high-speed car accident where he was unrestrained. Defendant repeatedly argued with J.B. concerning his rough treatment of Jackson and admitted responsibility for some of Jackson's injuries, including a bruise on his wrist and cut on his cheek. Defendant repeatedly denied doing anything that would have harmed Jackson but then admitted that he was rough with him, shook him several times, and threw him on the bed and couch. Defendant admitted that Jackson had been driving him crazy and he was frustrated and angry. This evidence

established quite convincingly that defendant had knowledge of the harm such actions posed to Jackson's life and consciously disregarded it.  (See *Brothers*, *supra*, 236 Cal.App.4th at p. 34 [the defendant's testimony "unequivocally established she engaged in a deliberate and deadly assault because she had been enraged, 'out of control,' and unable to calm herself"].)

Defendant fails to identify any evidence from which a reasonable juror could conclude that his forceful shaking and throwing of Jackson was objectively dangerous, meaning he acted with at least criminal negligence, but could nevertheless "entertain a reasonable doubt" that he actually appreciated that risk, meaning he acted without implied malice.  (*Brothers*, *supra*, 236 Cal.App.4th at p. 34; see *People v. Guillen* (2014) 227 Cal.App.4th 934, 1027.)  Defendant does not explain how, if that underlying act was objectively dangerous, a juror could have concluded that he did not realize the danger.  While defendant told Detective Green that he did not intend to kill Jackson, implied malice does not require such intent.  If a reasonable person would have understood that shaking Jackson with same force as falling from a two- or three-story building or a high-speed car crash was dangerous to human life, there is no apparent reason that defendant would not have so understood.  In turn, if the jury concluded that he actually appreciated the objectively apparent risk and thus acted with implied malice, it would have still convicted him of murder.  We note the complete lack of any evidence that defendant "was mentally or emotionally impaired so that he could not understand the risk he was causing to [Jackson]'s life."  (*Evers*, *supra*, 10 Cal.App.4th at p. 597.)

This case is factually and procedurally similar to *Evers*.  In that case, the two-year-old victim, Michael, was killed by either violent shaking or "a substantial impact, equivalent at least to a 10–foot drop and possibly a 20– to 30–foot fall."  (*Evers*, *supra*, 10 Cal.App.4th at p. 593.)  The court recognized that "the pivotal question … was whether there was sufficient evidence for a reasonable juror to find defendant Evers acted without consciously realizing the risk to Michael's life" (*id*. at p. 596) and concluded:

53.

"The *severity* of Michael's injuries on this occasion makes clear that whoever abused Michael had to know such abuse would likely cause serious injury or death. The undisputed evidence showed Michael was physically abused with 'major force' causing injuries equivalent to those resulting from a 10– to 30–foot fall." (*Id*. at p. 597.) Similarly, in *Brothers* and *Guillen*, the defendants were capable adults with no mental impairments, and both courts emphasized the absence of any evidence that the defendants lacked a subjective understanding of the risk to human life that their conduct posed. (See *Brothers*, *supra*, 236 Cal.App.4th at pp. 34–35; *People v. Guillen*, *supra*, 227 Cal.App.4th at pp. 1027–1028.)

"Because the evidence presented at trial did not raise a material issue as to whether defendant acted without malice, the trial court was not obliged … to instruct the jury on involuntary manslaughter .…" (*People v. Cook* (2006) 39 Cal.4th 566, 597.) Accordingly, defendant fails to demonstrate that the trial court erred by not instructing the jury on involuntary manslaughter.

### 2. *Harmless Error*

A trial court's erroneous failure to instruct on a lesser included offense in a noncapital case is state law error to be reviewed under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836–837.[22] (*People v. Beltran* (2013) 56 Cal.4th 935, 955; *Breverman*, *supra*, 19 Cal.4th at pp. 177–178.) Under *Watson*, " 'a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*Beltran*, at p. 955.) "The failure to instruct on a lesser included offense in a noncapital case does not require reversal 'unless an examination of the entire record establishes a reasonable probability that the error affected the outcome.' [Citation.] 'Such posttrial review focuses not on what a reasonable jury *could* do, but what such a

---

[22] Defendant fails to provide any legal support for his assertion that we should review this error under the test of *Chapman v. California* (1967) 386 U.S. 18.

jury is *likely* to have done in the absence of the error under consideration.' " (*People v. Thomas* (2012) 53 Cal.4th 771, 814, fn. omitted.)

We conclude it is not reasonably probable that the jury would have convicted defendant of involuntary manslaughter, but not second degree murder, if it had been given the option. It is undisputed that three-month-old Jackson was in defendant's care when he died as a result of the injuries defendant inflicted on him. The evidence that defendant used force upon Jackson that a reasonable person knew would likely be dangerous to the life of an infant was overwhelming. Jackson's injuries confirm that defendant used force that a reasonable person knew was dangerous to Jackson's life because Jackson had fractured ribs and subdural and retinal hemorrhaging. At least three physicians testified that Jackson's injuries were similar to those one would sustain in a motor vehicle accident, falling off of a two- or three-story building, or being hit or shaken by another person. Given Jackson's extensive, serious injuries and defendant's admission that he shook Jackson and threw Jackson on the bed and couch because Jackson would not stop crying, the only possible inference the jury could draw from the evidence presented is that a reasonable person would have known that defendant's assault on Jackson was dangerous to his life. (See *Evers*, *supra*, 10 Cal.App.4th at p. 597.)

Furthermore, we find no prejudice from failing to instruct on involuntary manslaughter because the jury was not left with an "all-or-nothing choice." (*People v. Smith* (2013) 57 Cal.4th 232, 239–240 [" '[t]he rule [requiring courts to instruct on lesser included offenses] prevents either party, whether by design or inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other' "].) The jury was properly instructed that second degree murder required a finding of malice, and malice was defined in the instructions requiring that defendant acted with knowledge of the danger and conscious disregard for human life.

However, defendant was also charged with assault on a child causing death, which does not include malice as an element. If the jury found defendant was responsible for Jackson's death based on an assault by means of force likely to produce great bodily injury, but did not find that defendant acted with knowledge of the danger to and conscious disregard for human life, under the instructions given it would have found him guilty of the assault charge, but not the murder charge. Instead, the jury found defendant guilty of both crimes, reflecting its determination that defendant assaulted Jackson with knowledge of the danger of defendant's actions and with conscious disregard for Jackson's life.

Therefore, we conclude that it is not reasonably probable that instructions on involuntary manslaughter as a lesser included offense would have led to a different result.

## IV. *The trial court erred in imposing a $1,000 child abuse prevention restitution fine because that fine is not applicable to convictions under sections 187 and 273ab.*

The trial court ordered defendant to pay a $1,000 fine pursuant to section 294, subdivision (a), which provides in relevant part: "Upon conviction of any person for a violation of *Section 273a, 273d, 288.5, 311.2, 311.3, or 647.6*, the court may, in addition to any other penalty or restitution fine imposed, order the defendant to pay a restitution fine … not to exceed five thousand dollars ($5,000) .…" (Italics added.) Defendant was convicted of crimes pursuant to sections 187 and 273ab, which are not listed in section 294, subdivision (a). Therefore, as both parties agree, the trial court erred in ordering defendant to pay this fine. As the case is being remanded for the reason discussed below, the trial court should not impose this fine when resentencing defendant.

## V. *Remand for resentencing in light of amendment to section 654.*

Defendant argues he is entitled to be resentenced under the new sentencing provisions in section 654, which became effective on January 1, 2022. (Stats. 2021, ch. 441, § 1.) The People agree remand is required in this instance, as do we.

56.

At the time defendant was sentenced, former section 654, subdivision (a) required that a defendant who committed an act punishable by different provisions of laws had to be punished under the provision that provided for the longest possible term. Assembly Bill No. 518 (2021–2022 Reg. Sess.) modified section 654, subdivision (a) to permit an act or omission punishable under two or more provisions of law to "be punished under either of such provisions." (Stats. 2021, ch. 441, § 1.) Thus, under the new law, a trial court now has the discretion to punish a defendant under any of the applicable provisions.

Under *In re Estrada* (1965) 63 Cal.2d 740, "[w]hen the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date." (*People v. Brown* (2012) 54 Cal.4th 314, 323, fn. omitted.) Nothing in Assembly Bill No. 518 suggests legislative intent that the amendments apply prospectively only, and defendant's case is not yet final. (See *People v. Vieira* (2005) 35 Cal.4th 264, 306.)

Where an ameliorative statute like this one is retroactive, a remand is appropriate unless "the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) There is no clear indication what sentencing decisions the trial court would have made if it was bound by section 654, subdivision (a), as amended by Assembly Bill No. 518. Therefore, we agree with the parties that remand is appropriate so the trial court may fully resentence defendant anew, incorporating the new legislative changes. (See *People v. Buycks* (2018) 5 Cal.5th 857, 896, fn. 15.)

At resentencing the trial court will have the opportunity to exercise its discretion to apply section 654 under the new law. Our decision should not be read as expressing an opinion on how the court should exercise its discretion.

## DISPOSITION

The sentence is vacated, and the matter is remanded to the trial court to exercise its discretion under Penal Code section 654, as amended by Assembly Bill No. 518. (Stats. 2021, ch. 441, § 1.)  In resentencing defendant, the trial court shall not impose a fine pursuant to section 294, subdivision (a).  The judgment is otherwise affirmed.


HILL, P. J.

WE CONCUR:


LEVY, J.


DETJEN, J.


58.